IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA

Lynchburg Division

| | |
|---|---|
| Christopher Jaggars, | ) Case No. |
| Plaintiff, | ) 6:14-cv-00015 |
| v. | ) |
| Sandy Spring Bank, | ) |
| Defendant. | ) |

AMENDED COMPLAINT

COMES NOW the plaintiff, by counsel, who moves this Court to enter judgment against the defendant on the grounds stated herein.

PARTIES

1. The plaintiff, Christopher Jaggars, is a resident of the City of Lynchburg, Virginia.

2. Sandy Spring Bank is a Maryland corporation which conducts banking business in the Commonwealth of Virginia through numerous branches.

STATEMENT OF FACTS

3. On January 26, 2009, at the time that his business was injured, the plaintiff Christopher Jaggars was engaged in the business of purchasing residential real estate for the purpose of renting the property to tenants and holding the property as an investment so that he could later sell the property at an appreciated value. He operated his business as a sole proprietorship and the business was to be engaged in investing and managing residential real estate which involved, among other

1

things, purchasing investment real estate property that he intended to lease to tenants, leasing the property to tenants, managing the property, collecting rent from the tenants, and thereby obtaining business income that would be reported as business income on Schedule C of his personal income tax return.

4. The plaintiff Christopher Jaggars was told by a personal acquaintance who was employed at Gateway Mortgage about an opportunity invest in residential real estate. Jaggars decided to enter the business of investing in residential real estate with the intention of buying a house and renting one of his houses to tenants. First, he needed to buy a rental house and he began the process of searching for a house to buy. When Suzanne Johnson, who was employed at Gateway Mortgage Group, learned that Jaggars was engaged in the business of investing in residential real estate, she targeted him as a potential victim of the DpFunder program that she was promoting in the Central Virginia area on behalf of Global Direct Sales, L.L.C. ("Global Direct Sales"). Global Direct Sales is a forfeited Maryland limited liability company. Johnson knew that Jaggars intended to purchase investment real estate because she was employed at Gateway Mortgage Group, in addition to and separately from, her promotion of Global Direct Sales DpFunder program, and she became aware that Jaggars was engaged intended to purchase investment real estate because he had discussed with Gateway Mortgage Group financing for the purchase of investment real estate.

5. Global Direct Sales is owned by Ryan Hill, a Maryland

resident, who also owns and operates Rycho Funding, L.L.C. ("Rycho"), a Maryland limited liability company. Herein, Hill, Global Direct Sales, and Rycho will be referred to as the "Hill conspirators," collectively.

6. Johnson targeted Jaggars as potential participants in Global Direct Sales' DpFunder program, which she was marketing through her limited liability company, LMFL Investments, L.L.C. because she knew that Jaggars intended to pursue the business of investing in residential real estate and the DpFunder scheme was a scheme that was marketed only to people who intended to buy residential real estate.

7. Johnson, acting for her company, LMFL Investments, found Phillip Booth, the owner of 1510 Club Drive, Lynchburg, Virginia, who was struggling to pay his mortgage payments. The tax-assessed value of the 1510 Club Drive property was $213,700.00.

8. Booth and Jaggars entered into a contract whereby Jaggars would purchase Booth's property at 1510 Club Drive for $290,000.00.

9. Johnson showed Jaggars a PowerPoint presentation entitled "LMFL Investments, LLC Presents . . . An Incredible Investment Through Private Financing," which, although confusing, seemed to describe a scheme whereby Jaggars could borrow money for the purchase of investment real estate by LMFL Investments, to be occupied by tenants, who would buy the property when they could obtain financing. The presentation stated that "LMFL Responsibilities" included "procur[ing]" the property to be

3

purchased, the tenant/buyer, financing for the initial loan and the refinance loan, and management of the property. The LMFL program was a variation of the DpFunder program, but Johnson described the program in language that obscured the reality that the program would have required Jaggars to sell Owners Alliance memberships.

10. Prior to the closing of Jaggars' purchase of the 1510 Club Drive property from Booth, which was being financed by Gateway Mortgage Group, where Johnson was employed, Johnson presented to the plaintiff Christopher Jaggars a document entitled "DpFunder Residential Dealer Agreement." Under the agreement, Jaggars (if he had participated in the program, which he did not) would be paid sales commissions by Global Direct Sales if he sold "memberships to the client associations, of Global Direct Sales, L.L.C., in North America." Although Jaggars did not understand the DpFunder scheme, the scheme would have worked like this, in the Booth-Jaggars transaction: Jaggars would have been employed by Global Direct Sales as a "dealer" or "memberships" in the DpFunder "Owners Alliance," Jaggars would have "sold" Booth a membership in an "Owners Alliance" that provided sham benefits like discounts at theme parks, the sales price for the "Owners Alliance" membership would have been the amount of the down payment Jaggars needed to get a loan to purchase Booth's house, Jaggars would have obtained a loan from a mortgage company that Suzanne Johnson located in an amount greater than the purchase price of the property, and money in an amount equal to the

4

purchase price paid by Booth for his membership in the "Owners Alliance" would be shown on the real estate closing Settlement Statement as a seller's expense paid to Rycho Funding. In other words, the mortgage company would have loaned Jaggars enough money to pay the entire purchase price, including the down payment; the down payment would be recharacterized as a seller's expense; and Rycho Funding would receive an amount equal to what it denominated as Jaggars' commission for selling Booth the Owners Alliance membership, which it would then pay to Jaggars. In a nutshell, the DpFunder scheme was a way for people like Jaggars to borrow the money needed for their down payment and to conceal that they borrowed the down payment. Johnson tried to persuade Jaggars that the DpFunder program was a business opportunity that would be profitable for Jaggars. It would have been profitable, but it was a scheme to defraud the mortgage company.

11. Jaggars did not fully understand that Johnson was trying to persuade him to enter the DpFunder program, but he nevertheless did not agree to the program that Johnson and LMFL Investments offered. Jaggars did not enter into the DpFunder scheme. He merely pursued the business of investing in residential real estate that he had already begun to pursue before he met Johnson. Johnson recognized him as a potential participant in the DpFunder scheme, because the DpFunder scheme targeted people like Jaggars who invest in residential real estate, but Jaggars chose not to participate in the DpFunder scheme and he pursued only the

5

original business of investing in residential real estate which involved, among other things, purchasing residential real estate, leasing the residential property to tenants, collecting rent from the tenants, and reporting the rental income as business income on Schedule C of his personal income tax return. Jaggars did not agree to participate in, and did not participate in, the program (upon information and belief, the DpFunder forms were forged by Johnson, who has been convicted of numerous counts of forging DpFunder documents): he did not sell any memberships or obtain any benefits from the DpFunder program.

12. To be clear, the DpFunder business that Johnson was promoting was a separate and different business from Jaggars' residential real estate investment business. Jaggars was already pursuing his residential real estate investment business before he met Johnson, he continued to pursue that business through all of the events described in the complaint, and he continues to pursue that business. The DpFunder scheme that Johnson promoted was a scheme that allowed purchasers of real estate to conceal from the mortgage company the fact that the purchaser borrowed all of the purchase money in a real estate transaction, including the down payment. Jaggars rejected Johnson's sales pitch and did not willingly or knowingly participate in the DpFunder scheme.

13. Instead of Jaggars purchasing the 1510 Club Drive property from Booth, Johnson purchased the property at a foreclosure sale for $194,746.00. Booth was taken out of the transaction at that point: Jaggars never sold, and Booth never purchased, a

6

membership in the "Owners Alliance."

14. Johnson, acting through LMFL Investments, then sold the 1510 Club Drive property to Jaggars for $231,234.00. However, unknown to Jaggars, Johnson obtained for Jaggars a loan from Gateway Mortgage Group in an amount in excess of the purchase price and Johnson conspired with Rycho, who conspired and acted in concert with Sandy Spring Bank, to substantially conform the transaction into a DpFunder dealer transaction. Specifically, Johnson paid $49,600.00 of the loan proceeds to Rycho, Rycho set up a bank account in Jaggars' name at Sandy Spring Bank, Rycho deposited the $49,600.00 into the account, Rycho then acted in concert with Sandy Spring Bank to pay the $49,600.00 in (ostensibly) Jaggars' account to Global Direct Sales, and Global Direct Sales issued a fraudulent IRS Form 1099 in the amount of $49,600.00 to Jaggars for the purpose of concealing the payment of the $49,600.00 to Rycho. At this point, prior to conducting discovery, the plaintiff does not know why Johnson paid Rycho in this particular transaction, but it is apparent that Rycho was paid $49,600.00 even though it had no legitimate right to be paid part of the loan proceeds.

15. At the closing of the sale of 1510 Club Drive by LMFL Investments to Jaggars, $49,600.00 in loan proceeds was paid by the Settlement Agent to Rycho L.L.C. to pay a debt that Rycho falsely claimed (in a letter to the Settlement Agent) was due to it by the plaintiff Christopher Jaggars pursuant to a non-existent "Assignment of Funds."

7

16. The plaintiff Christopher Jaggars did not sell any memberships or perform any other acts that would have entitled him to payment of sales commissions from Global Direct Sales. Nevertheless, Rycho paid the funds it received pursuant to the fraudulent "Assignment of Funds" to Global Direct Sales, which opened a savings account in the name of the plaintiff Christopher Jaggars at Sandy Springs Bank, without Jaggars' knowledge or consent.

17. On January 26, 2009, Global Direct Sales issued a fraudulent Form 1099, falsely showing that it had paid $43,500.00 in sales commissions to the plaintiff Christopher Jaggars in 2008.

18. The purpose of the fraudulent Form 1099 was to allow Global Direct Sales to conceal the loan proceeds that it received from its sister-company Rycho, as the proceeds of Rycho's fraudulent procurement of the $49,600.00 in loan proceeds, and to shift the tax liability for the income that it received from the Jaggars loan closing from Global Direct Sales to the plaintiff Christopher Jaggars. Global Direct Sales, through the fraudulent Form 1099, falsely represented to the Internal Revenue Service ("IRS") that the money was received by the plaintiff Christopher Jaggars, not by Rycho.

19. <u>THE DIFFERENCE BETWEEN THE PLAINTIFF CHRISTOPHER JAGGARS' BUSINESS OF INVESTING IN RESIDENTIAL REAL ESTATE, AND THE DpFUNDER PROGRAM</u>:

(A) Jaggars' business of investing in residential real estate is the business that was injured by the conspiracy alleged

8

in this complaint. He was engaged in the business of investing in residential real estate prior to meeting Suzanne Johnson, and he would have pursued that business even if he had never met Suzanne Johnson. He did not agree to participate in any scheme with Suzanne Johnson or the Hill conspirators and he did not conduct any business with them (the only exception to this is that Johnson compensated Jaggars for, according to Johnson, a portion of the difference in amount between the mortgage payments that Jaggars was actually responsible for paying after they purchased 1510 Club Drive and the mortgage payments stated in the Truth-in-Lending Disclosure Statement and by Johnson prior to the closing). The only business that Jaggars conducted was the purchase of residential real estate as an investment, which included, among other things, purchasing investment real estate property that he intended to lease to tenants, leasing the property to tenants, managing the property, collecting rent from the tenants, and thereby obtaining business income that would be reported as business income on Schedule C of his personal income tax return.

(B) Jaggars does not allege in this complaint that he was a participant in the DpFunder program. Suzanne Johnson tried to persuade him to sell to Booth a membership in the DpFunder program Owner's Alliance when Jaggars purchased 1510 Club Drive from Booth, but Jaggars refused to do so.

(C) Jaggars was injured in his actual business of investing in residential real estate because Johnson, the Hill

9

conspirators, and the defendant Sandy Spring Bank acted to make it appear that Jaggars participated in the DpFunder program during the course of conducting his residential real estate business of purchasing 1510 Club Drive, by (without Jaggars' knowledge) obtaining excess loan proceeds on Jaggars' mortgage loan, conspiring to open a bank account in Jaggars' name at Sandy Spring Bank, putting the excess loan proceeds in the bank account, fraudulently characterizing the excess loan proceeds as Jaggars' commission from his sale of a DpFunder Owner's Alliance membership to Booth, taking the money from the account and keeping it, and issuing a fraudulent IRS Form 1099 to Jaggars, which created a tax liability for him. The conspirators' action of imposing the fraudulent tax liability on Jaggars was an injury to his business of investing in residential real estate in the following ways:

   (a)   the conspirators targeted him because he was engaged in the business of investing in residential real estate;

   (b)   the scheme resulted in him being liable to the mortgage company for the excess proceeds Johnson borrowed and paid to Rycho; and

   (c)   the tax liability that was created was a financial injury imposed upon Jaggars' business of investing in residential real estate because the tax liability reduced the financial gain Jaggars would have made in the 1510 Club Drive transaction if the fraudulent tax liability had not been created by the conspirators.

CLAIM FOR RELIEF

VIOLATION OF VA.CODE § 18.2-499 and 500

20. The allegations of paragraphs 1-19 are adopted herein.

21. The defendant Sandy Spring Bank engaged in a money laundering conspiracy with the Hill conspirators for the purpose of injuring the plaintiff Christopher Jaggars' business of real estate investment, through (upon the plaintiff's information and belief)[1] the act of a Sandy Spring Bank employee to, knowingly and in cooperation with Hill conspirators, open a bank account in Jaggars' name, without his permission and in violation of the USA Patriot Act, which allowed the Hill conspirators to use Jaggars as an unwitting front-man to conceal from the IRS income, specifically the loan proceeds that Rycho procured by its fraudulent misrepresentation that the plaintiff Christopher Jaggars had assigned it funds, and to shift Global Direct Sales' tax liability to the plaintiff.

22. The defendant Sandy Spring Bank, (upon information and belief) through at least one of its employees, working within the

---

[1] The basis of the defendant's belief that an employee of the defendant committed these acts is the evidence in the Transcript of Proceedings on December 2, 2009 in <u>Commonwealth v. Suzanne Johnson</u>, Criminal Case No. 09-020420), which shows that the defendant opened bank accounts in the name of other persons in the Lynchburg area, who did not agree or consent to the opening of the accounts, did not have knowledge of the accounts, and did not present identification as required by the USA Patriot Act, and those other persons from the Lynchburg area were harmed in the same way as the plaintiff herein, and there is no way that the defendant could have opened those accounts unless one of the defendant's employees opened the accounts, and there is no reason why the defendant would have opened the accounts unless it agreed with and conspired with the Hill conspirators.

11

scope of her employment, agreed with the Hill conspirators, and acted in concert with them, to harm the plaintiff Christopher Jaggars' business (of investing in real estate) by opening a bank account in Jaggars' name without Jaggars' knowledge and in violation of the USA Patriot Act, which was a necessary step in the Hill conspirators' money-laundering scheme, that resulted in Global Direct Sales falsely providing to the IRS a Form 1099 which showed that the plaintiff had been paid a commission of $43,500.00 by Global Direct Sales, when he had not been paid such a commission. In fact, the defendant and the Hill conspirators had used his name to open a Savings Account at the defendant bank, without the plaintiff's permission and entirely within the control of, and for the benefit of, the Hill conspirators. The conspirators then moved the fraudulently obtained loan proceeds into the account to make it appear as if the money was Christopher Jaggars' money. Global Direct Sales then issued a fraudulent Form 1099 to falsely report to the IRS that the money was income earned by the plaintiff.

24. Each of the conspirators was necessary to complete the conspiracy: (1) Rycho, through its owner Hill, was necessary to transfer to Global Direct Sales the money that it fraudulently obtained from the real estate settlement; (2) Global Direct Sales, through its owner Hill, was necessary to obtain the money from Rycho on the fraudulent pretense that it owed Christopher Jaggars a commission, to open a bank account at Sandy Spring Bank for Christopher Jaggars, even though he had not authorized the

opening of such account, and to provide a false Form 1099 to the IRS; (3) it was necessary for Sandy Springs Bank to bypass its normal procedures--which are stated on signs in its offices, written policies, and on its website--and allow Global Direct Sales to open a Savings Account in Christopher Jaggars' name, even though Jaggars did not authorize the opening of such account. If Sandy Springs Bank had not opened the account, the Hill conspirators would have had no basis for claiming that the money identified in the false Form 1099 was the plaintiff's money and not the Hill conspirators' money. Sandy Springs Bank failed to comply with the Customer Identification Program rules implementing Section 326 of the USA Patriot Act by not requiring the person opening the account in Christopher Jaggars' name to identify himself as Christopher Jaggars, and the bank paid the money that was in the account (putatively in the name of Christopher Jaggars) to one of the Hill conspirators, without Jaggars' knowledge or authorization. If Sandy Spring Bank had acted properly, and required that the Hill conspirators provide proof of the plaintiff's identity when the account was opened, and refused to open the account unless proof of the plaintiff's identity was provided, the Hill conspirators could not have accomplished their goal of laundering the money by claiming that it was paid to Jaggars. The commission of the acts by each conspirator, in cooperation with each other, and towards the same end, demonstrate that the conspirators agreed and acted in concert with each other to pursue the unlawful purpose of

13

laundering the money.

23. The conspirators, including the defendant, achieved the object of their conspiracy through, among other acts:

    (a) the illegal acts of fraud by the Hill conspirators in opening and making transactions on the savings account;

    (b) upon information and belief, an employee of Sandy Springs Bank, whose identity the plaintiff has not yet discovered, agreed with the other conspirators to act during the time and scope of her employment with the defendant, and while under the supervision of the defendant so as to render the defendant liable, to willfully and knowingly fail to comply and with the Customer Identification Program rules implementing Section 326 of the USA Patriot Act and the customer due diligence requirements required the U.S. Department of the Treasury Financial Crimes Enforcement Network when the defendant opened and allowed transactions on the account. The basis of the defendant's belief that an employee of the defendant committed these acts is the evidence in the Transcript of Proceedings on December 2, 2009 in <u>Commonwealth v. Suzanne Johnson</u>, Criminal Case No. 09-020420), which shows that the defendant opened bank accounts in the name of other persons in the Lynchburg area, who did not agree or consent to the opening of the accounts, did not have knowledge of the accounts, and did not present identification as required by the USA Patriot Act, and those other persons from the Lynchburg area were harmed in the same way as the plaintiff herein, and there is no way that the defendant

14

could have opened those accounts unless one of the defendant's employees opened the accounts, and there is no reason why the defendant would have opened the accounts unless it agreed with and conspired with the Hill conspirators; and

(c) of falsely filing, by Global Direct Sales, an information tax return in violation of federal law.

24. The acts committed by the defendant Sandy Springs Bank, and which make the defendant liable for the injury that the plaintiff suffered as a result of the conspiracy are: allowing Global Direct Sales to open a Savings Account in Christopher Jaggars' name, even though Jaggars did not authorize the opening of such account, which required the bank to bypass its normal procedures--which are stated on signs in its offices, written policies, and on its website, and acting in violation of the Customer Identification Program rules implementing Section 326 of the USA Patriot Act by not requiring the person opening the account in Christopher Jaggars' name to identify himself as Christopher Jaggars, and by paying the money that was in the account (putatively in the name of Christopher Jaggars) to one of the Hill conspirators, without Jaggars' knowledge or authorization, all with the goal of advancing the money laundering conspiracy.

25. The business of the plaintiff which the defendant conspired to injure was the plaintiff's business of investing in residential real estate. That business involved making a profit by purchasing residential real estate, leasing property to

15

tenants, managing the property, and obtaining rental income that would be reported on Schedule C ("Income from Business") of the plaintiff's personal income tax return. The business was injured by being subjected to taxation by the IRS through the fraudulent information tax return on income that it had not actually received. The income that was falsely reported on the false Form 1099 was income that Jaggars was required to report on Schedule C ("Income from Business") of his personal income tax form. As a direct and proximate result of the conspirators' act of filing the fraudulent Form 1099, Jaggars was required to pay tax on business income that he never actually obtained, which reduced the net profit that he realized from his business of investing in residential real estate which involved, among other things, purchasing residential real estate, leasing property to tenants, managing the property, and obtaining rental income that would be reported on Schedule C ("Income from Business") of the plaintiff's personal income tax return.

26. The defendant acted with malice toward Christopher Jaggars, because the defendant's employee who, acting within the scope of her employment, opened the bank account in Jaggars' name knew of, yet utterly disregarded, Jaggars' legal right to not be the object of the conspirators' money laundering scheme, yet the employee opened an account in his name and allowed account transactions to be made by the Hill conspirators without verifying the identity of the plaintiff. The employee's malice is imputed to the defendant because the employee was acting

within the scope of her employment, within the supervision of the defendant, and within the controls established by the defendant.

27. As a direct and proximate result of the conspiracy to launder money through falsely reporting that he earned income, the plaintiff Christopher Jaggars was damaged by incurring tax liability on the falsely reported business income in the amount of approximately $12,021.00, and incurring attorney's fees to determine what had happened and what remedies he could pursue, in the amount of approximately $3,000.00, a total of $15,021.00.

28. The plaintiff Christopher Jaggars has also been damaged by the payment of attorney's fees and costs required to prosecute this action and the loss of interest on the money that it has lost.

29. The defendant acted with utter and reckless disregard of Christopher Jaggars' right to not incur tax liability as a result of having the Hill conspirators' ill-gotten gains laundered through a bank account opened in the plaintiff's name and to not have a false Form 1099 filed with the IRS.

30. The plaintiff's cause of action for damages resulting from the money laundering conspiracy accrued when the false Form 1099 was filed with the IRS on January 26, 2009. Up to that time, Rycho Funding had obtained loan proceeds by false pretenses, the conspirators had opened a bank account in the plaintiff's name, had put the loan proceeds in the account, and the conspirators had exercised dominion and control over the funds. Up until January 26, 2009, the plaintiff had not been injured in an amount

greater than he had suffered when the money was stolen, which was not a part of the money laundering conspiracy but was part of the separate crime of obtaining money by false pretenses. Prior to the filing of the false Form 1099, the conspirators had not yet laundered the money, and the plaintiff did not yet have grounds for an action alleging a money laundering conspiracy. The plaintiff was first injured by the money laundering conspiracy when Global Direct Sales reported to the IRS that the plaintiff had received the money as income, resulting in a tax liability to the plaintiff, concealing to the IRS that the funds were stolen by the Hill conspirators, and concealing Global Direct Sales' tax liability on the stolen money.

31. Sandy Spring Bank has engaged in a similar pattern of conduct on an ongoing and systematic basis. The records of this Court (e.g., the Transcript of Proceedings on December 2, 2009 in <u>Commonwealth v. Suzanne Johnson</u>, Criminal Case No. 09-020420) show that the defendant was involved in the same pattern of activity involving other residents of the Lynchburg area, which resulted in injury to those persons of the same type suffered by the plaintiff here.

<u>PRAYER FOR RELIEF</u>

32. WHEREFORE, the plaintiff prays that this Court will award judgment in its favor in the amount equal to compensatory damages in the amount of $15,021.00, trebled in the amount of $45,063.00, plus interest, plus punitive damages in the amount of $350,000.00 to deter the defendant from repeating its conduct, attorney's

fees, as allowed by Va.Code § 18.2-500, and any other legal and equitable relief to which he may be entitled.

Respectfully Submitted,

CHRISTOPHER JAGGARS

By: /s/ GARY M. BOWMAN

Gary M. Bowman, Esq.
VSB No. 28866
2728 Colonial Ave., Ste. 100
Roanoke, Virginia 24015
Tel: (540) 343-1173
Fax: (540) 343-1157

## CERTIFICATE OF SERVICE

I, Gary M. Bowman, do hereby certify that a true and correct copy of this Amended Complaint was mailed to John Falcone, Esq., Petty, Livingston et al., 725 Church Street, Lynchburg, Virginia 24504 on July 9, 2014.

/S/ GARY M. BOWMAN
GARY M. BOWMAN