IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| CHRISTOPHER JAGGARS,<br><br>                               *Plaintiff,*<br><br>v.<br><br>SANDY SPRING BANK,<br><br>                             *Defendant*. | CIVIL NO. 6:14-cv-00015<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

      This action was originally filed by Plaintiff Christopher Jaggars ("Plaintiff" or "Jaggars") on January 22, 2014 in the Circuit Court of the City of Lynchburg, and on May 1, 2014, Defendant Sandy Spring Bank ("Defendant" or "SSB") removed the case to this Court pursuant to 28 U.S.C. § 1441. Plaintiff alleges that SSB conspired with other actors to injure his residential real estate investment business in violation of the Virginia business conspiracy statutes, Va. Code §§ 18.2-499 and -500. Specifically, Plaintiff contends that SSB acted in concert with other individuals to injure his business by transferring money through an unauthorized account opened in his name, an action that allegedly left him with a tax liability for income that he did not earn. The matter is now before me on Defendant's Motion for Summary Judgment. For the reasons that follow, namely Plaintiff's failure to establish the elements of legal malice or of damage to a business interest, I will grant Defendant's motion.

## I. BACKGROUND

      The circumstances giving rise to this case can be traced back to 2008, when Jaggars first decided to buy real estate for use as a rental property. He did so at the suggestion of a friend, who had experience in the field by way of her employment at Gateway Mortgage Group. When

another Gateway Mortgage employee, Suzanne Johnson ("Johnson"), learned that Jaggars planned to invest in residential real estate, she identified him as a potential target for a mortgage fraud scheme that she had been operating, the DpFunder program. The mechanics of this scheme were somewhat complicated, but in essence the program defrauded mortgage companies by allowing buyers to obtain a loan for the funds needed to make a down payment while simultaneously concealing the fact that this money had been borrowed. Johnson approached Jaggars and attempted to conscript him into the DpFunder program, even going so far as to identify a property, 1510 Club Drive in Lynchburg, VA ("Club Drive property"), as a potential target for the fraud.

Although Jaggars declined to participate in the DpFunder program, he did agree to collaborate with Johnson in order to purchase the Club Drive property and convert his current residence into rental property. The two agreed that Jaggars would move into the Club Drive property while Johnson would locate tenants to rent Jaggars' existing primary residence. At the time of this agreement, the Club Drive property's owner, Phillip Booth ("Booth"), was struggling to make his mortgage payments on a property tax-assessed at a value of $213,700. On January 8, 2008, Johnson, acting through her corporation, LMFL Investments, brokered a deal between Booth and Jaggars whereby Jaggars would purchase the Club Drive property for $290,000. On April 14, 2008, Johnson purchased the Club Drive property at a foreclosure sale for $194,746. Later that same day, Johnson, again acting through LMFL Investments, sold the property to Jaggars for $231,234. Johnson also arranged the financing for this transaction, having obtained a loan for Jaggars from Gateway Mortgage Group in the amount of $275,000, which provided loan proceeds in excess of the purchase price. At the closing, the settlement agent paid $49,600 in loan proceeds to another corporation involved in the DpFunder scheme, Rycho Funding, L.L.C.

("Rycho"). The loan proceeds were delivered due to a letter submitted by Rycho claiming that Jaggars owed it $49,600 pursuant to an "Assignment of Funds." Jaggars claims to have no knowledge of this transaction, and allegedly believed that the money that was funneled off to Rycho was actually paid towards the purchase price of the Club Drive property. Although Jaggars purchased the Club Drive property in April 2008, he did not actually rent out any property to tenants until late 2008 or early 2009.

Following discussions between SSB personnel and Johnson co-conspirators Ryan Hill ("Hill") and Scott Nash ("Nash"), another co-conspirator, Jennifer Siever ("Siever"), visited a SSB branch in Airpark, Maryland on March 6, 2008 and opened an escrow account. The account listed Siever as the agent, or the bank's customer/client, and Jaggars as the account's beneficiary. Although SSB opened the account without obtaining a signature or other authorization from Jaggars, when an escrow account's agent is a natural person rather than a business entity, SSB policy and applicable law requires permission only from the account's agent, not from its beneficiary. Siever deposited a $43,500 DpFunder residential dealer commission check, payable to Jaggars. On April 14, 2008, Global Direct Sales, another corporation involved in the DpFunder scheme, wired $43,500 from the account to the agent closing the sale of the Club Drive property. On January 26, 2009, Global Direct Sales issued to Jaggars an Internal Revenue Service ("IRS") Form 1099, a tax document that reports certain miscellaneous income not included in a W-2. The form stated that Global Direct Sales had paid Jaggars $43,500 in sales commissions in 2008, and that Jaggars owed $12,021 in taxes on this income. After receiving the document, Jaggars wrote to the IRS contesting his tax liability. The IRS did not respond, and as of the March 20, 2015 hearing on this motion, the agency has declined to take any enforcement action.

- 3 -
Case 6:14-cv-00015-NKM-RSB   Document 77   Filed 04/14/15   Page 3 of 8   Pageid#: 1316

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; s*ee also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

## III. DISCUSSION

A claim under for the Virginia business conspiracy statutes, Va. Code. §§ 18.2-499 and -500, must establish the following three elements: "(1) concerted action between two or more people; (2) legal malice towards Plaintiff's business; and (3) that the conspiratorial actions caused Plaintiff's business damages." *Rogers v. Deane*, 992 F. Supp. 2d 621, 635 (E.D. Va. 2014) *aff'd,* No. 14-1156, 2014 WL 5753849 (4th Cir. Nov. 6, 2014). Additionally, in Virginia, "an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014)

(quoting *Hechler Chevrolet, Inc. v. General Motors Corp.,* 337 S.E.2d 744, 748 (Va. 1985). As set forth below, assuming arguendo that SSB's actions with regards to the escrow account constituted "concerted action," and that Jaggars had a residential real estate business on the date of the alleged injury, a reasonable finder of fact still could not determine that Plaintiff has established all three requisite elements.

The second element of the Virginia business conspiracy statutes, "legal malice," requires that the plaintiff prove, by clear and convincing evidence, that the defendant acted "intentionally, purposely, and without lawful justification." *Dunlap*, 754 S.E.2d at 317 (quoting *Commercial Bus. Sys., Inc. v. BellSouth Servs.,* 453 S.E.2d 261, 267 (Va. 1995)). The plaintiff, however, need not prove that the defendant's "primary and overriding purpose is to injure another in his trade or business." *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 453 S.E.2d 261, 267 (Va. 1995). The plaintiff must, however, establish that such a purpose was at least one of the goals of the conspiracy. *Simmons v. Miller*, 544 S.E. 2d 666, 676-77 (Va. 2001).

Plaintiff argues that SSB acted with legal malice because it knew from the onset that the escrow account was an artifice that would harm Jaggars by imposing a tax liability on him for income that he did not earn. The evidence establishes that Johnson co-conspirators Hill and Nash met with Todd Levine ("Levine"), a SSB salesperson, to discuss opening accounts at the bank. Levine then referred Hill and Nash to Jacequelyn Yankanich ("Yankanich"), the manager of the Airpark, Maryland SSB branch, who met with the two and discussed how SSB could fulfill their banking needs. Levine and Yankanich maintain that Hill and Nash discussed their business in only general terms during these meetings. Yankanich remembers the two stating that they had employees who did sales for them all over the country and that they needed escrow accounts to deposit their employees' commissions while sales were pending, whereas Levine

recalls them describing "some sort of mortgage product." Hill, by contrast, contends that he described the DpFunder scheme to both Yankanich and Levine in some detail. Drawing all reasonable inferences in the light most favorable to Jaggars, the nonmoving party, I will assume for the purposes of this decision that Hill and Nash did in fact communicate the nature of the DpFunder program and that the accounts would used in furtherance of this scheme.

Even under these circumstances, however, there is no evidence that SSB's actions were motivated by a desire to harm Jaggars' business interests. The record does not indicate that SSB knew anything about Jaggars beyond the fact that he existed and was the beneficiary of an escrow account at the bank. There is certainly no evidence that SSB knew that Jaggars operated a residential real estate investment business. Moreover, at the time Siever opened the account in March 2008, Jaggars owned only one property, his primary residence, as he did not purchase the Club Lane property until April 2008 and did not have tenants at either property until late 2008 or early 2009. A fact finder would need to pile inference upon inference in order to determine that SSB intended to harm this nascent enterprise. Accordingly, I find no basis to conclude that SSB acted "intentionally [and] purposefully" to injure Jaggars "in his trade or business," as is required to prove legal malice. *Simmons*, 544 S.E.2d at 677.

The third element of the Virginia business conspiracy statutes is that the conspiracy must result in an injury to the plaintiff's business interests. *See, e.g.*, *Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) ("In an unbroken line of federal district cases, beginning with Judge Mehrige's opinion in *Federated Graphics Companies, Inc. v. Napotnik*, 424 F. Supp. 291, 293-4 (E.D. Va. 1976) and continuing as late as *Nationwide Mutual Fire Insurance Co. v. Jones*, 577 F. Supp. 968, 969-70 (W.D. Va. 1984), the federal district courts in Virginia have consistently held that a right of action is 'afforded [under these statutes] only when malicious conduct is directed

at one's *business*, not one's *person*,' and that the statute 'focuses upon conduct directed at property, *i.e.*, one's business' and applies only to 'conspiracies resulting in business-related damages.'"). Further, the Supreme Court of Virginia has clarified that these statutes "apply to business and property interests, not to personal or employment interests." *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003).

Plaintiff asserts that SSB harmed "Jaggars' two business interests: his business venture of *investing in residential real estate* or his separate business *of independent contracting business as a DpFunder residential dealer*." (emphasis in original). I disregard the latter claim because it is inconsistent with the language of the Amended Complaint, which reads: "Jaggars did not agree to participate in, and did not participate in, the program . . . he did not sell any memberships or obtain any benefits from the DpFunder program," and "Jaggars rejected Johnson's sales pitch and did not willingly or knowingly participate in the DpFunder scheme."[1] Further, even if Jaggars had been a participant in the fraudulent DpFunder scheme, it is unclear to me how SSB's actions could have harmed his stake in that enterprise.

In any event, the record does not show that the alleged conspiracy caused Plaintiff to sustain damages. Plaintiff claims that his damages accrued on January 26, 2009, when he received the Form 1099 from Global Direct Sales. Jaggars contends that this form caused him to incur a tax liability of $12,021 and $3,000 in legal fees. However, in a subsequent deposition, Jaggars stated that he never paid the $12,021 assessment, that he wrote a letter to the IRS contesting the fee, and that while the IRS never responded, they also took no action to collect the assessment. In the same deposition, Jaggars also admitted that the $3,000 in legal fees were the result of an unrelated bankruptcy filing, although he did pay counsel $5,000 for his services in

---

[1] These are but two among numerous instances where Plaintiff denies any sort of involvement with the DpFunder program or any related scheme.

this case. As a threshold matter, I note that Global Direct Sales, not Defendant or the IRS, issued the Form 1099. Given the fact that Jaggars has disputed his liability with the IRS and that the agency has taken no enforcement action, any damages stemming from the Form 1099 are purely speculative. Moreover, any such damages would appear to be personal in nature and unconnected to Plaintiff's business of investing in residential real estate. As for Plaintiff's attorney's fees, it is well-settled that "the American Rule presumes that the word 'damages' means damages exclusive of fees," especially where, as here, the statute at issue provides for the recovery of attorney's fees and damages separately. *See, e.g., Summit Valley Indus. Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 722-23 (1982). Accordingly, I determine that no rational finder of fact could conclude that Defendant's actions resulted in an injury to Plaintiff's business interests.

## IV. CONCLUSION

For the foregoing reasons, I will grant Defendant's Motion for Summary Judgment. An appropriate order follows this memorandum opinion.

The Clerk of the Court is directed to send a certified copy of this memorandum opinion and accompanying order to all counsel of record.

ENTERED: This 14th Day of April, 2015.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE